ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: AUG 2 5 2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                      :
UNITED STATES OF AMERICA              :        **INFORMATION**
                                      :
            - v. -                    :        22 Cr. ___ (LTS)
                                      :
AIMEE HARRIS and                      :
ROBERT KURLANDER,                     :
                                      :
            Defendants.               :
                                      :
- - - - - - - - - - - - - - - X

**JUDGE SWAIN**

**22 CRIM 457**

## COUNT ONE

### (Conspiracy to Commit
### Interstate Transportation of Stolen Property)

The United States Attorney charges:

#### Overview

1.   In or about September 2020, AIMEE HARRIS and ROBERT
KURLANDER, the defendants, conspired to steal, transport across
state lines, and sell personal property that belonged to an
individual (the "Victim") whom HARRIS and KURLANDER knew was an
immediate family member of a then-former government official who
was a candidate for national political office ("Candidate-1").
The Victim had stored the property in a private residence in
Delray Beach, Florida (the "Residence"), at which HARRIS was
temporarily residing.  After HARRIS stole the property, she
enlisted KURLANDER to help her facilitate its sale.  HARRIS and
KURLANDER then met in Manhattan with employees of an
organization based in Mamaroneck, New York (the "Organization").

During that meeting, HARRIS described the circumstances of how she had obtained the property, and provided the property to the Organization.  After the meeting, and at the Organization's request, HARRIS and KURLANDER returned to Florida to obtain more of the Victim's property in order to provide it to the Organization.  They later met with an Organization employee in Florida and gave that employee more of the Victim's stolen property, believing that the Organization would transport or cause the transport of the stolen property from Florida to the Organization's offices in New York.  The Organization then did so.  Ultimately, the Organization paid HARRIS and KURLANDER each $20,000.

<u>HARRIS's Initial Theft of the Victim's Property</u>

2.    In or about the spring of 2020, the Victim resided with a friend (the "Friend") at the Residence.  When the Victim moved out of the Residence, on or about June 17, 2020, the Friend gave the Victim permission to store a significant number of personal items at the Residence, which the Victim did. Accordingly, the Victim stored at the Residence, among other things, a handwritten journal containing highly personal entries (the "Journal"), tax records, a digital camera, a digital storage card containing private family photographs, a cellphone, books, clothing, and luggage.

3.    On or about June 19, 2020, approximately two days

2

after the Victim moved out of the Residence and stored property there, the Friend invited AIMEE HARRIS, the defendant, to temporarily stay in the same room of the Residence that the Victim had previously used.  While there, HARRIS discovered the property that the Victim was storing in the Residence.  At the time, HARRIS knew that the Victim was a member of the immediate family of Candidate-1.

4.    On or about August 19, 2020, AIMEE HARRIS, the defendant, contacted ROBERT KURLANDER, the defendant, and asked for his assistance in selling certain of the Victim's property, including the Journal and the digital storage card containing private family photographs.  That same day, KURLANDER texted HARRIS that he would help her "make a SHIT TON of money" from selling the Victim's property.

HARRIS and KURLANDER's First Attempt to Sell the Stolen Property

5.    On or about September 6, 2020, AIMEE HARRIS and ROBERT KURLANDER, the defendants, attended a political fundraiser in Florida meant to benefit the campaign of an individual ("Candidate-2") who was running for office against Candidate-1. HARRIS and KURLANDER attended the fundraiser with the intent of showing the Victim's stolen property to a campaign representative of Candidate-2, hoping that the political campaign would purchase it.

6.    In advance of the fundraiser, ROBERT KURLANDER, the

defendant, texted AIMEE HARRIS, the defendant, "On Sunday you may have a chance to make so much money," and reminded her to bring the property to the event.  By that time, HARRIS had stolen additional items belonging to the Victim from the Residence and responded to KURLANDER, "Omg.  Coming with stuff that neither one of us have seen or spoken about," and added, "I can't wait to show you what Mama has to bring Papa."

7.   On or about September 10, 2020, a representative of Candidate-2's political campaign conveyed to AIMEE HARRIS and ROBERT KURLANDER, the defendants, that the campaign was not interested in purchasing the property and advised HARRIS and KURLANDER to provide the items to the Federal Bureau of Investigation ("FBI").  KURLANDER texted HARRIS, "[Candidate-2] campaign can't use it.  They want it to go to the FBI.  There is NO WAY [Candidate-2] can use this.  It has to be done a different way . . . ."

HARRIS and KURLANDER's Initial Contact With the Organization

8.   Later on or about September 10, 2020, ROBERT KURLANDER, the defendant, texted AIMEE HARRIS, the defendant, "I have a call with [the Organization] today," "I'm gonna find a way for you to make some money from this."

9.   On or about that same day, September 10, 2020, an employee of the Organization ("Employee-1") instructed AIMEE HARRIS and ROBERT KURLANDER, the defendants, to use an encrypted

application to communicate with the Organization.  Thereafter,
KURLANDER used such an application to send photographs to the
Organization of some of the Victim's property that HARRIS had
removed from the Residence.  After receiving the photographs,
the Organization offered to pay for airfare, hotel, and car
service for HARRIS and KURLANDER to transport the property from
Florida to New York City.

First Interstate Transportation of the Victim's Stolen Property

10.  On or about September 12, 2020, AIMEE HARRIS and
ROBERT KURLANDER, the defendants, flew at the Organization's
expense from Florida to New Jersey with certain of the Victim's
items that HARRIS had stolen from the Residence, including,
among other things, the Journal, a digital camera, and the
digital storage card containing private family photographs.
Shortly before the flight, KURLANDER texted HARRIS, "Let's have
fun !!!!!  And make money."  HARRIS "liked" the text message.
After landing in New Jersey, HARRIS and KURLANDER — with the
Victim's property in tow — took a car service to a luxury hotel
in New York City, at the Organization's expense.

11.  That evening, on or about September 12, 2020, AIMEE
HARRIS and ROBERT KURLANDER, the defendants, met at the
Manhattan hotel with employees of the Organization, including
Employee-1 and an executive of the Organization ("Executive-1").
At this meeting, HARRIS and KURLANDER provided the Victim's

property that HARRIS had removed from the Residence to the
Organization.  HARRIS described how she obtained that property;
disclosed that the Victim had additional property stored in the
Residence; and explained that HARRIS continued to have access to
the Residence.  HARRIS's explanations to the Organization during
this meeting confirmed for KURLANDER that HARRIS had stolen the
Victim's property.

12.  Also during the course of the meeting on or about
September 12, 2020, and at a dinner that same evening, as well
as during conversations held within the week, Employee-1 told
AIMEE HARRIS and ROBERT KURLANDER, the defendants, that
Employee-1 wanted HARRIS and KURLANDER to provide more of the
Victim's property to the Organization, in part as a means of
authenticating the Journal, and that the value of the items
previously provided by HARRIS and KURLANDER to the Organization
would increase if additional items were obtained.  Additionally,
during the September 12, 2020 dinner, Executive-1 agreed to make
an initial payment from the Organization to HARRIS of $10,000
for the property that HARRIS and KURLANDER had provided the
Organization earlier in the day.

13.  Two days later, and the day after AIMEE HARRIS and
ROBERT KURLANDER, the defendants, returned to Florida from New
York at the Organization's expense, on or about September 14,
2020, KURLANDER set out the plan to sell the Victim's stolen

property to the Organization, texting HARRIS, "I'm expecting
that they're gonna pay up to $100,000 each maybe more . . . .   I
made it so that the 10,000 is NOT your only payment as it was
written and if this does turn into something good or
blockbusting then I'll get us more money.  They of course come
across as the nicest people in the world but their job is to pay
the least and they aren't your or my best friends.  They are in
a sketchy business and here they are taking what's literally a
stolen diary and info . . . and trying to make a story that will
ruin [the Victim's] life and try and effect the election.  [The
Victim] can easily be thinking all her stuff is there and not
concerned about it. . . we have to tread even more carefully and
that stuff needs to be gone through by us and if anything
worthwhile it needs to be turned over and MUST be out of that
house."

<u>Additional Theft of the Victim's Property</u>

14.  After AIMEE HARRIS, the defendant, had described the
circumstances under which she had obtained the Victim's
property, and between on or about September 13 and 17, 2020,
Employee-1 asked HARRIS and ROBERT KURLANDER, the defendant, to
return to the Residence so that they could obtain and provide to
the Organization more of the Victim's belongings that HARRIS had
described earlier but not yet provided to the Organization.
Employee-1 also repeatedly informed HARRIS and KURLANDER that he

was working in consultation with and at the direction of an executive at the Organization ("Executive-2").

15.   On or about September 17, 2020, ROBERT KURLANDER, the defendant, used an encrypted application to text Employee-1 that removing the Victim's property and providing it to the Organization was risky and so the Organization should agree to pay them more money: "[w]e don't want to do more or anything else or give anything else until we have some consideration spelled out.  We are doing everything we say we will do.  It's just not fair.  We are taking huge risks.  This isn't fair."

16.   Around that same time, AIMEE HARRIS and ROBERT KURLANDER, the defendants, and the Organization engaged in negotiations for additional payments to be made by the Organization to HARRIS and KURLANDER in exchange for the Victim's property.

Second Interstate Transportation of the Victim's Stolen Property

17.   On or about September 17, 2020, AIMEE HARRIS and ROBERT KURLANDER, the defendants, stole more of the Victim's property from the Residence, including, among other things, tax documents, clothing, and luggage, with the intent of providing those items to the Organization.

18.   That same day, on or about September 17, 2020, Employee-1 traveled from New York to Florida to personally retrieve the additional property that AIMEE HARRIS and ROBERT

KURLANDER, the defendants, had just stolen out of the Residence and from the Victim.  All three of them met in Florida, and HARRIS and KURLANDER provided the items to Employee-1.  The following day, on or about September 18, 2020, KURLANDER met with Employee-1 again in Florida and provided an additional bag of the Victim's property to Employee-1.  HARRIS and KURLANDER provided these items to Employee-1 with the understanding that Employee-1 intended to transport or cause the transportation of those items from Florida to New York.

19.  The next day, on or about September 19, 2020, Employee-1 shipped the stolen property from Florida to the Organization's offices in New York.

<u>The Organization Paid HARRIS and KURLANDER<br>for the Victim's Property</u>

20.  In or about September and October 2020, and consistent with the encrypted message that ROBERT KURLANDER, the defendant, had sent on or about September 17, 2020, the Organization paid AIMEE HARRIS and ROBERT KURLANDER, the defendants, a total of $40,000 for the Victim's stolen property, as follows:

a.    On or about September 18, 2020, the Organization paid $10,000 to a representative of HARRIS.

b.    On or about October 21, 2020, the Organization paid $20,000 to a representative of KURLANDER.

c.    On or about October 24, 2020, the Organization

paid $10,000 to a representative of HARRIS.

### Statutory Allegations

21.    In or about September 2020, in the Southern District of New York and elsewhere, AIMEE HARRIS and ROBERT KURLANDER, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, interstate transportation of stolen property, in violation of Title 18, United States Code, Section 2314.

22.    It was a part and object of the conspiracy that AIMEE HARRIS and ROBERT KURLANDER, the defendants, and others known and unknown, would and did transport, transmit, and transfer in interstate and foreign commerce goods, wares, merchandise, securities, and money, of the value of $5,000 and more, knowing the same to have been stolen, converted, and taken by fraud.

### Overt Acts

23.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

           a.    On or about September 12, 2020, AIMEE HARRIS and ROBERT KURLANDER, the defendants, transported certain of the Victim's stolen property from Florida to New York.

           b.    On or about September 17, 2020, HARRIS and

10

Case 1:22-cr-00457-LTS   Document 2   Filed 08/25/22   Page 11 of 13


KURLANDER provided more of the Victim's stolen property to Employee-1 with the understanding that Employee-1 would cause the property to be transported from Florida to New York.

(Title 18, United States Code, Section 371.)

## FORFEITURE ALLEGATION

24.  As a result of committing the offense alleged in Count One of this Information, AIMEE HARRIS and ROBERT KURLANDER, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

## Substitute Asset Provision

25.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third person;

c.  has been placed beyond the jurisdiction of the

Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which

cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21,

United States Code, Section 853(p) and Title 28, United States

Code, Section 2461(c), to seek forfeiture of any other property

of the defendants up to the value of the above forfeitable

property.

               (Title 18, United States Code, Section 981;
            Title 21, United States Code, Section 853; and
            Title 28, United States Code, Section 2461.)

                                  *Damian Williams*
                                  DAMIAN WILLIAMS
                                  United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

v.

### AIMEE HARRIS and
### ROBERT KURLANDER,

Defendants.

### INFORMATION

22 Cr. ____ (LTS)

(18 U.S.C. § 371.)

DAMIAN WILLIAMS
United States Attorney